**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00213-CR**

_____

**PATRICK CALVIN REILLEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-01-00051-CR**

**MEMORANDUM OPINION**

Appellant, Patrick Calvin Reilley, appeals his conviction for Indecency with

a Child, who we refer to as "Ann," by Contact.[1] *See* Tex. Penal Code Ann. §

21.11(a)(2). A jury found Reilley guilty and assessed punishment at fifteen years

and six months of incarceration in the Texas Department of Criminal Justice. In a

---

[1]We use initials to refer to the alleged victim, a minor child, and pseudonyms to refer to the child's family members. *See* Tex. Const. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

1

single issue, Reilley complains that the evidence is insufficient to support the trial court's judgment. As discussed below, we affirm the trial court's judgment.

## Background

### Kai Henderson

Kai Henderson testified that she is the school counselor at Oak Ridge Elementary and has been a school counselor for nine years. In November 2020, Ann went to Henderson's office, "upset…[and] emotional." After speaking with Ann, Henderson filed a report with CPS regarding "suspect[ed] abuse[.]"

### Ann

Ann testified that in November 2020, she was eleven years old, and that she lived with her mother, her older sister, and Reilley in an apartment in Spring. According to Ann, that month she and Reilley were watching a "scary movie" in her mother's room alone. Ann was lying on her side at the foot of the bed and Reilley was "closer to the headboard." Her mother and her older sister were in the apartment in different rooms. Ann testified that while watching the movie, Reilley touched her breasts and vagina under her clothes with his fingers. Ann recalled what outfit she was wearing that day, the noises of the television during the assault, and the noise of the shifting comforter as Reilley moved across the bed. Ann testified that she felt "scared" during the assault and that she was afraid of Reilley.

At some point, her mother walked into the room and Reilley "scooted back on the bed and started acting like nothing was happening." Her mother stayed in the bathroom for about five minutes, Ann went directly into her room and stayed in her room for the rest of the night. According to Ann, she stayed in her room because she was "terrified" of Reilley.

A week later Ann went to school and wrote a note to a friend, who convinced her to speak to Henderson. That same day, Ann went with her mother to have a forensic interview and a Sexual Assault Nurse Examination ("SANE examination"). According to Ann, the November 2020 incident was not the only time Reilley touched her. She recalled a time when she was around eight years old, and her family was living in a different house. Reilley had told Ann to tell her mother that she did not feel good so she could stay home from school. Ann followed Reilley's instructions and stayed home with Reilley. After eating lunch, Reilley told Ann to come sit with him in a brown recliner, started to "roughhous[e]" with her, touching her breasts." Ann testified she believed the touching when she was eight years old was accidental. During cross-examination, Ann stated there were times Reilley would wrestle with her and her sister, and Reilley would accidentally touch her. Ann denied that she wanted her mother and father to "get back together[.]" Ann also admitted that she gave inconsistent statements about pain she experienced during the assault in her forensic interview and SANE examination.

**Audrey Terrell**

Audrey Terrell testified she is a thirteen-year detective with the Montgomery County Sheriff's Department in the special victims unit with Children's Safe Harbor. In November 2020, Terrell was assigned to Ann's case, where she reviewed the initial file written by the patrol deputy and began her investigation. Terrell contacted Ann's mother and determined where the assault happened. Photographs of the apartment where Ann lived at the time of the assault were admitted into evidence. Terrell also reviewed Ann's forensic interview. Terrell reviewed the SANE examination and findings, which she testified did not produce any DNA. She explained this was not unusual because the assault had happened a week before the examination. Terrell then interviewed Reilley. According to Terrell, Reilley admitted to touching Ann, but stated it was "accidental." Reilly told her "that he would play wrestle with [Ann] and her sister. And sometimes he would pick them up and throw them in play wrestling, and he would accidentally touch their private areas." Reilley also told Terrell about another time when he touched Ann's private area while helping her climb into his lap, and that he was "freaked out about it." According to Terrell, Reilley told her that each time he would accidently touch Ann, he would tell his wife and apologize to Ann. At no time did Reilley tell Terrell that he stopped accidently touching Ann. Terrell found Reilley's statement about apologizing to Ann's mother to be "odd[,]…[because] it continues to happen."

4

During cross-examination Terrell admitted she did not interview Ann, but later explained, "We try not to make them continue to tell their stories and to relive that trauma over and over. So that's why we conduct the forensic interviews[,] so they only have to do it once." Terrell did not believe Ann's mother was protective of her. Terrell testified that Ann's mother did not believe the allegations and that "she was -- she wasn't supportive of [Ann]. She was disappointed that Mr. Reilley had to move out of the home because of the allegations. She didn't appear to be surprised about the allegations."

**Casey Crosby**

Casey Crosby testified she worked as a forensic interviewer at Children's Safe Harbor from 2018 to 2021. She detailed her educational and professional background and stated that she conducted the forensic interview with Ann on November 10, 2020. She explained that the purpose of Children's Safe Harbor is "to reduce trauma in children and families and reduce the amount of times the child has to speak about an experience." She described a forensic interview as "a fact-finding neutral interview to gather information on details a child may or may not have experienced or witnessed." Crosby then explained how she conducts a forensic interview with a child and stated that during her career, she has conducted approximately 1,500 forensic interviews.

5

In Ann's interview, Crosby and Ann discussed the difference between a truth and a lie, and Crosby observed Ann's demeanor change when she began to discuss the sexual abuse. She described Ann as very quiet and softspoken, but that when she discussed the sexual abuse, she became more "fidgety." During the interview, Ann disclosed that Reilley "had been touching her breasts and vagina." Ann stated that it felt "weird" and that the assault "hurt[.]" Ann told Crosby that Reilley had assaulted her two times, once the week before the interview and once when she was eight years old. According to Ann, in November 2020, "[Reilley]…had touched on her breast under the clothing and also on her vagina under the clothing and that his fingers had gone inside her vagina." Ann described sensory details of the assault including the sound of the television, and her hands feeling the bed. She also detailed the assault when she was eight years old. She stated that morning, she woke up, ate breakfast and Reilley pulled her towards his lap to sit with him when she walked through the living room. Reilley touched her on her vagina over her clothing.

**Brookley Del Bosque**

Brookley Del Bosque testified she currently is employed as the nursing and programs director with Texas Forensic Nurse Examiners. She has been a forensic nurse for over four years. She stated that forensic nursing "is a specialized form of nursing where we take care of victims of violence which could include sexual assault, human trafficking, domestic violence, and other forms of violence." She

described her educational and professional background, and the specific certifications required to become a forensic nurse.

Del Bosque conducted Ann's medical forensic examination on November 10, 2020. A copy of Del Bosque's examination was admitted into evidence without objection. Del Bosque read from her report Ann's description of the assault by Reilley.

> Patient states: So pretty much um I was hanging out with my step-dad so he kinda tried to touch me in my areas so I tried to pull myself away but it didn't work. So, my mom came into the room 'cuz we were in my mom and my step-dad's room watching a show. So she came in to use the bathroom but then my stepdad stopped trying to and then she left and then he tried again so I tried to push away further but that time it kinda worked, until I came in there for another part of the show and he eventually got me and then she went in to use the restroom again 'cuz she needs the restroom a lot and then he let go and then I ran away to my room to go play on my phone.

Ann reported digital penetration by Reilley. Ann also recalled a second assault at her "old house" but could not remember the details. Del Bosque conducted a genital examination on Ann and documented that she did not observe any injuries to Ann or her hymen. Del Bosque testified that she did not expect to see any injuries because Ann had already started puberty and her genitals are "able to stretch, and…its less likely to sustain any kind of injuries that we would see." Del Bosque collected evidence from the genital examination and the swabs were sent off for testing. But she testified that she did not expect to find DNA because the assault happened over five days prior.

**Mother**

Ann's mother ("Mother") testified that she has two children, Ann and Ann's older sister. She was married to Ann's father, but they divorced in 2014. Ann and her sister currently live with Ann's father. Mother met Reilley in November 2013, and they were married in December 2015. She ended her relationship with Reilley in 2021, although she has not divorced Reilley because she cannot afford to file for divorce. According to Mother, Ann first met Reilley when she was three years old and made the allegations against him when she was nine years old and in elementary school. The day Ann outcried, Mother picked Ann up from school, but she did not ask who the allegations were against because "[she] didn't think about it." She testified that after Ann told her counselor at school, Ann saw Reilley at home before her forensic interview and SANE examination, and she appeared "very nervous" and "standoff-ish with him." At first, Mother was supportive of Ann and the allegations, but later it changed, because "I wasn't completely convinced that he did something." She believed nothing had happened based on Ann's demeanor and that "I just didn't think he could do something like that." Reilley told Mother early in their relationship that he had a friend wrongly accused and that this "was not something he ever wanted to be accused of." Mother admitted she did not know the name of Reilley's falsely accused friend until the week before trial. Mother also did not believe Ann because Ann had previously told her she wanted her parents to get back together. Mother

8

testified that Reilley would play wrestling games with her girls and lift Ann in the air like an airplane. During those times Reilley would sometimes touch Ann inappropriately. Reilley admitted to Mother that he accidentally touched Ann's breasts, vagina, and butt several times. At the time, Mother did not find these disclosures odd, but now she does. Mother now believes Ann. She testified that she observed a change in Ann, she is now scared around men and "is not the same little girl she used to be." She noted that Ann has been in counseling for at least a year.

During cross-examination Mother admitted that she rented an apartment for Reilley in her name, and she and her girls stayed with him during a snowstorm in February 2021. She stated that during their relationship, Reilley was the main disciplinarian of her children, and that Ann had animosity towards Reilley because of this.

**Dr. Danielle Madera**

Doctor Danielle Madera testified as an expert witness for the State. Madera testified that she is a psychologist, that she has been licensed for thirteen years and is licensed in both Florida and Texas. She described her educational and professional background and stated that she has worked with "over a thousand[]" sexually abused children. Madera reviewed Ann's forensic interview, SANE examination, incident report, and counseling records in preparation for her testimony.

9

Madera described the term "grooming[,]" explaining it is "any action that's deliberately taken with the goal of building a trusting relationship with that child, lowering their inhibitions to later sexually abuse that child." According to Madera, family members can groom children, including building relationships with the child's caregivers to build trust and gain more access to the child. This also lowers the likelihood that the child is believed if they disclose the abuse to the caregiver. Madera noted there is a wide array of trauma responses from sexually abused children, but none by itself is indicative of child sexual abuse. These signs include depression, anxiety, interpersonal difficulties, and sexualized behaviors. Madera testified that if a perpetrator is "hypervigilant" about committing sexual abuse, including telling the parent or caregiver every time they touch the child, it could be a sign of "intent to sexually abuse the child." She also discussed barriers to a child's disclosure including the child's age, developmental level, feelings of shame or guilt, family burdens, such as financial or other siblings whose parent may be the perpetrator. According to Madera, there are different stages of disclosure, including tentative or partial disclosure. The next stage is active disclosure and Madera noted that some children can reaffirm what they say or "take back and say… it didn't happen." She discussed that if the parent or caretaker does not believe the child, it could be "a big portion of recantation." Madera explained that children sometimes

10

have a "sensory memory[]" such as what they "smell, taste, [or] hear" and those details "are more salient as they are recalling events."

**Patrick Reilley**

Reilley testified in his own defense at trial. Reilley confirmed that he was previously convicted of burglary of a habitation in 2004 and spent thirty months in prison. Reilley denied that he intentionally touched Ann's breasts or vagina with the intent to sexually gratify or arouse himself or Ann. According to Reilley, he met Mother online in November 2013, and they married in December 2015. He met Ann when she was three years old. He described his relationship with Ann before she made the allegations, stating they were "close" and she was a "playful kid[,]" and their family would play fight all the time. Reilley testified that he "accidentally clipped her by her vagina" as he picked her up. According to Reilley, "[i]t kind of freaked me out[,]" and he told Mother.

In November 2020, Reilley recalled that he was alone in his bedroom watching television. Mother came into the room to shower and then Ann came into the bedroom and asked to watch a movie. He recalled that he started to "play flight[]" with Ann and Ann's sister came into the bedroom and started to play fight as well. He testified that "I grabbed [Ann], I flipped her over my head onto the bed, and I cupped her breast." He denied that he touched her intentionally. Reilley stated that he roughhoused with both girls pretty much every day. He described the girls as

11

"frisky" and stated they "liked to play." When Reilley heard about Ann's allegations, he did not believe they were against him because "you know, I never did anything to her." After Ann's outcry, Reilley left the apartment for about two weeks. Mother then leased Reilley an apartment in her name in which he lived at for almost a year until he was arrested. Reilley admitted that he saw Ann after the allegations, including a period when Ann stayed at his apartment, and he stayed at Mother's home while Ann was there.

During cross-examination, Reilley discussed his fear of being falsely accused because of his friend that was imprisoned and later exonerated. When the State told Reilley that they did not find a driver's license or criminal history for the name he provided for his friend, he stated he "might have spelled it wrong." Reilley also admitted again that he had "two slips" in which he touched Ann's breasts or vagina when he was "scooping her up" and when he was "roughhousing."

The jury found Reilley guilty of indecency with a child by sexual contact and a "true" finding of one enhancement paragraph. After a separate trial on punishment, the jury sentenced Reilley to fifteen years and six months of incarceration in the Texas Department Criminal Justice. Reilley timely appealed.

## Issue

In a single issue on appeal, Reilley challenges the sufficiency of the evidence to support the jury's verdict. Reilley argues that although he admitted touching

sexual areas of Ann's body, there is no evidence he did so "for anyone's sexual gratification or arousal."

**Standard of Review**

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citation omitted). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761–62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13). The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for indecency with a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (providing that child's testimony alone is sufficient to support a conviction for a sexual offense when the child is under the age of seventeen at the time of the alleged offense); *Chasco v. State*, 568 S.W.3d 254, 258 (Tex. App.—Amarillo 2019, pet. ref'd).

14

To establish the offense of indecency with a child by contact, the State had to prove that Appellant engaged in sexual contact with Ann, a child younger than seventeen years old. *See* Tex. Penal Code Ann. § 21.11(a)(1). Section 21.11's definition of "sexual contact" includes the act, if committed with the intent to arouse or gratify the sexual desire of any person, of "any touching by a person, including touching through clothing, of . . . any part of the genitals of a child[.]" *Id.* § 21.11(c)(1). As noted above, the testimony of either a child victim or an outcry witness is sufficient to support a conviction for indecency. *See* Tex. Code Crim. Proc. Ann. art. 38.07; *Chasco*, 568 S.W.3d at 258. The State has no burden to produce any corroborating or physical evidence. *See Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006) (concluding that medical or physical evidence need not corroborate child victim's testimony). A person's intent to arouse or gratify sexual desire can be inferred from the person's conduct and the surrounding circumstances. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); *see also Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) (explaining that all the evidence—both direct and circumstantial—admitted at trial to support the conviction should be reviewed equally on appeal).

Courts give wide latitude to testimony provided by child victims of sexual abuse. *See Jones v. State*, 428 S.W.3d 163, 169 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi-Edinburg 2008, no pet.). We liberally construe such testimony. *See Lee*, 176 S.W.3d at 457; *see also Gonzalez Soto*, 267 S.W.3d at 332 ("The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult.").

**Analysis**

The jury heard Ann's testimony at trial that Reilley sexually assaulted her two times. First, when she was eight years old, Reilley told Ann to lie to her mother to stay home from school. After lunch that day, Reilley pulled her into his lap and touched her breast. Second, when Ann was ten years old, alone in his bedroom, he touched her vagina and breast while watching a movie. Ann told the jury that Reilley immediately pulled away when her mother came into the room. Ann discussed the November 2020 assault and repeated the same details in both her forensic interview with children's safe harbor and during her SANE examination. Her mother testified that Ann's demeanor has changed since the assault, that she is not the same little girl and that she is fearful around men. Mother also testified that Reilley told her he accidentally touched her daughters several times during their relationship. The jury also heard from Reilley in which he admitted to touching Ann inappropriately, but

16

stated it was an accident during roughhousing or picking Ann up. He stated that he told Mother each time it happened. The jury also heard testimony from Madera that hypervigilance of committing sexual assault, including telling a caretaker, can be indicative of intent to commit sexual assault.

Appellant argues the evidence is insufficient to support his conviction. Citing *Kempf v. State*, Nos. 05-21-00721-CR, & 05-21-00722-CR, 2022 Tex. App. LEXIS 4019, at *12–14 (Tex. App.—Fort Worth June 25, 2020, no pet.) (mem. op., not designated for publication), he contends that "words are insufficient to be [the] basis of intent to sexually arouse or gratify." We find *Kempf* distinguishable on the facts because in *Kempf*, the alleged victim did not testify. *See id*. The conviction was based on statements made by defendant which the Court of Appeals held did not amount to a confession of a sexual offense. The Court held the appellant "confessed to inappropriate sexual thoughts and responses. Thoughts, however inappropriate or disturbing, do not constitute a crime." *Id*. at *10–11. Here, the evidence at trial included not only Reilley's testimony, but also the victim's testimony about the details of, and circumstances surrounding, the alleged offenses. Ann testified Reilley was alone with her when both assaults occurred, and the reason Reilley was alone with her on the first occasion was that he convinced her to lie to her mother so she could stay home from school. On the second occasion, according to Ann's testimony, Reilley touched her breasts and genitals under her clothes, contradicting

17

the notion that he "accidentally" touched her private areas while wrestling with her. Based on the evidence, a rational jury could reasonably infer that Reilley acted with the intent to sexually arouse or gratify his sexual desires. *See Laster*, 275 S.W.3d at 521; *McKenzie*, 617 S.W.2d at 216; *see also* Tex. Penal Code Ann. § 21.11. Viewing the evidence in a light most favorable to the verdict and deferring to the jury's responsibility to determine the weight and credibility of the evidence and to resolve conflicts in the evidence, we affirm the trial court's judgment of conviction. *See Jackson*, 443 U.S. at 319; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13; *see also* Tex. Penal Code Ann. § 21.11. We overrule Reilley's issue.

Although not an arguable issue, we note that the judgment adjudicating Reilley's guilt does not correctly identify the statute under which Reilley was convicted. Reilley was convicted of the second-degree felony offense of indecency with a child by contact under section 21.11(a)(2) of the Texas Penal Code. The judgment, however, identifies only section 21.11(d) as the "Statute for Offense[.]" Section 21.11(d) lists the various degrees of a felony offense committed under section 21.11. Tex. Penal Code Ann. § 21.11(d). It does not provide the elements for the offense of indecency with a child by contact. *See id.* Rather, section 22.11(a)(2) identifies the elements of the offense of indecency with a child by contact as alleged in the indictment. *Id.* § 22.11(a)(2).

18

The Texas Rules of Appellate Procedure give this Court authority to modify judgments sua sponte to correct typographical errors and make the record speak the truth when we have the necessary information to do so. *See* Tex. R. App. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.). "Appellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record." *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Our authority to reform an incorrect judgment is not dependent upon the request of any party, and it does not turn on the question of whether a party has or has not objected in the trial court. *Id*. at 529-30. We therefore modify the judgment to reflect that "section 22.11(a)(2) of the Texas Penal Code" constitute the "Statute for Offense[.]" We affirm the trial court's judgment as modified.

AFFIRMED AS MODIFIED.

KENT CHAMBERS
Justice

Submitted on March 17, 2025
Opinion Delivered June 4, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.

19