**Opinion issued December 31, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00010-CR

_____

**RONALD LEE DEROUEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 90645-CR**

---

## MEMORANDUM OPINION

A jury convicted Ronald Lee DeRouen of the second-degree felony offense

of robbery and, after finding the allegations in an enhancement paragraph true,

assessed his punishment at 20 years' confinement.[1] In two issues on appeal, DeRouen argues that the trial court erred by admitting (1) evidence of three extraneous offenses because the prejudicial effect of the evidence substantially outweighed its probative value; and (2) a surveillance video that had not been properly authenticated.

We modify the judgment of the trial court and affirm as modified.

## Background

On February 5, 2020, Gloria Valdez (a manager) and Ana Maribel Orellana Debolanos (a cook) were working the morning shift at a Burger King in Pearland. Their shift began at 5:30 a.m., and the restaurant opened at 6:00 a.m. Around 6:30 a.m., Valdez saw a man, presumably a customer, enter the front doors and approach the counter. The man wore a "grayish hoodie," black pants, sunglasses, and a mask. Valdez could not see his face.

As Valdez walked to the register, she saw the man pull a dark colored gun out of his pocket. The man demanded money, and Valdez started walking to the office, where the restaurant kept the safe. The man accompanied her, and he had a plastic bag with him that Valdez assumed was for the money. While Valdez and the man were on the way to the office, Orellana heard voices and peeked her head out from

---

[1]     *See* TEX. PENAL CODE § 29.02(a).

2

the kitchen. Valdez informed her that the restaurant was being robbed, and the man told Orellana to follow Valdez.

Valdez knew that the main portion of the safe (accessible with a code) only held change. A smaller part of the safe (accessible with a key) held the bills. When confronted with the sight of only change in the safe, the man asked Valdez where the rest of the money was, and she responded that she needed a key to access that part of the safe. The man ordered Valdez to get the key, and they started walking to the front counter. Orellana took the opportunity to escape through the back door of the restaurant.

The restaurant had around $300 in the smaller part of the safe. After taking the money, the man ordered Valdez into the freezer but did not lock her in. She was in the freezer for a minute or two before she heard a noise and realized that she was still wearing her headset and that a customer had pulled up to the drive-through window. She informed the customer that she was being robbed and requested that the customer call 911. Not understanding what was happening, the customer started placing his order. Valdez interrupted him to repeat that she was being robbed. The customer cursed and drove away.

Valdez eased the door to the freezer open and crept to the nearby office. From the surveillance camera monitors in the office, it appeared that the man had fled the Burger King. She then used the office phone to call 911 and report the robbery.

3

When police officers arrived, Valdez gave a statement and showed an officer the surveillance cameras so he could review the footage. The trial court admitted a DVD recording of footage from the surveillance cameras over an authentication objection by defense counsel. Neither Valdez nor Orellana identified DeRouen in court as the man who robbed the Burger King. Investigators did not obtain any usable fingerprints or DNA evidence from the scene.

Before opening statements, the trial court held a hearing outside the presence of the jury on the admissibility of extraneous offenses. During this hearing, the State called a Houston Police Department detective to testify about a series of 27 business robberies investigated by a specialized unit in Harris County. The investigation began on December 9, 2019, and ended on February 7, 2020—two days after the robbery at issue in this appeal—when HPD officers arrested DeRouen. The detective briefly testified about the facts of each offense, including the date of the offense, the time of day the offense occurred, the location in Houston where the offense occurred, the type of business that was robbed, the physical description of the suspect and his clothing, the description of the car that the suspect used, whether any other people were involved in the robbery, whether the suspect displayed a weapon, whether the suspect made the employees go into the freezer, and whether the suspect was carrying a plastic bag. The State sought admission of all 27 extraneous offenses.

The trial court asked questions about the similarity of each extraneous offense to the charged offense. Ultimately, at the close of the hearing, the trial court allowed the State to present evidence of three extraneous offenses. These offenses occurred within a week of the charged offense: on February 1, February 3, and February 7, 2020. The robberies occurred at a fast-food restaurant early in the morning. The lone suspect displayed a handgun and carried a plastic bag in one of the robberies. He wore a gray hoodie, sunglasses, black shoes with a silver or white placard or emblem on the tongue of the shoe, and a face covering. The suspect also ordered the employees into the freezer before leaving the restaurants in a gray or black sedan. DeRouen pleaded guilty to each of these three extraneous offenses. The trial court ruled that these three offenses shared enough distinct characteristics with the charged offense such that they were admissible under Rule 404(b), and the prejudicial effect of these offenses did not substantially outweigh their probative value.

The first day of testimony focused on the charged offense: Valdez and Orellana testified, as did a Pearland Police Department officer who responded to Valdez's 911 call and a crime scene investigator who processed the scene for evidence. The second day of testimony focused on the extraneous offenses, with particular attention placed on the robbery that occurred on February 7, 2020, leading to DeRouen's arrest.

Three HPD officers testified about the circumstances leading to DeRouen's arrest, including surveillance that they had conducted on him, the arrest itself, and the clothing that he was wearing at the time of his arrest. This clothing—including DeRouen's hoodie, shoes, and face covering—were admitted into evidence. An HPD detective viewed the surveillance footage from the charged offense and DeRouen's clothing admitted into evidence and testified that the clothing appeared to match the clothing seen in the surveillance footage. The trial court also admitted the indictments and judgments of conviction for each of the three extraneous offenses. A Brazoria County Sheriff's Office crime scene investigator took DeRouen's fingerprints and compared his known prints to the prints on the three judgments. The known print matched the prints on two of the three judgments, but the print on the third judgment "was found to have insufficient detail to compare."

The trial court instructed the jury on the charged offense of aggravated robbery and the lesser-included offense of robbery. The jury found DeRouen guilty of the lesser-included offense. Following the punishment phase, the jury found the allegations in an enhancement paragraph true and assessed DeRouen's punishment at 20 years' confinement. This appeal followed.

**Admission of Extraneous Offense Evidence**

In his first issue, DeRouen argues that the trial court erred by admitting evidence that he had three prior convictions for robbery in Harris County because the prejudicial effect of this evidence substantially outweighed its probative value.

## A.    Standard of Review and Governing Law

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *see Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024) ("Under the abuse of discretion standard, we do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable."). We will uphold a trial court's ruling on admissibility of evidence as long as the ruling is within the "zone of reasonable disagreement." *Inthalangsy*, 634 S.W.3d at 754 (quotation omitted); *see Becerra*, 685 S.W.3d at 127 ("A trial judge abuses his discretion when no reasonable view of the record could support his ruling.").

Ordinarily, evidence of an extraneous offense is not admissible to prove the defendant's character in order to show that on a particular occasion the defendant acted in accordance with the character. TEX. R. EVID. 404(b)(1). The general rule is

that a defendant "may be tried only for the offense charged and not for any other crimes or for being a criminal generally." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). However, extraneous offense evidence may be admissible for another purpose, such as proving identity. TEX. R. EVID. 404(b)(2); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (characterizing Rule 404(b) as "a rule of inclusion rather than exclusion") (quotation omitted). Rule 404(b) "excludes only evidence that is offered solely for proving bad character and conduct in conformity with that bad character." *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016).

Even if evidence is admissible under Rule 404(b), the trial court may still exclude the evidence under Rule 403 if the court determines that the probative value of the evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. "Unfair prejudice refers to the evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022) (quotation omitted); *Valadez v. State*, 663 S.W.3d 133, 142 (Tex. Crim. App. 2022) ("Unfair prejudice means a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.") (quotations omitted).

When determining whether to exclude evidence under Rule 403, the trial court must balance the inherent probative force of the evidence and the proponent's need for that evidence against (1) any tendency of the evidence to suggest decision on an improper basis, (2) any tendency of the evidence to confuse or distract the jury from the main issues in the case, (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (4) the likelihood that presentation will consume an inordinate amount of time or be cumulative of evidence already admitted. *Hall v. State*, 663 S.W.3d 15, 32 (Tex. Crim. App. 2021) (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). Rule 403 presumes that the probative value of relevant evidence "exceeds any danger of unfair prejudice" and "envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quotation omitted).

## B.  Analysis

In addition to the charged offense, the trial court allowed the State to present evidence that DeRouen committed three additional robberies in Harris County. This evidence included judgments of conviction on DeRouen's guilty pleas for the three offenses, the indictments for the offenses, and testimony from HPD officers concerning their surveillance of DeRouen and the third extraneous offense. This

9

offense occurred two days after the offense at issue in this appeal and resulted in DeRouen's arrest. One of the HPD officers compared the clothes that DeRouen was wearing at the time of his arrest with the clothes that the suspect in this offense wore in the surveillance footage from the Burger King and concluded that the clothes appeared to be the same. The trial court concluded that admission of these extraneous offenses was permissible under Rule 404(b) because they shared distinctive characteristics with the charged offense and under Rule 403 because their prejudicial effect did not substantially outweigh their probative value.

DeRouen cites Rule 404(b) in his appellate brief but provides no substantive argument for why admission of the three extraneous offenses violated that rule.[2] Rather, he implicitly acknowledges that admission was proper under this rule by stating that Rule 404(b) "may allow evidence of identity to rebut a defensive theory,"

---

[2] We note that appellate courts have upheld the admission of extraneous offense evidence under Rule 404(b) when similarities between the charged offense and the extraneous offenses like the ones in this case are present. *See, e.g.*, *Clifford v. State*, 653 S.W.3d 1, 8 (Tex. App.—Austin 2022, pet. ref'd) (upholding admission of extraneous robbery offense when both offenses "showed a man wearing a skull mask covering his face, a green hoodie, black gloves, light colored jeans, and black shoes, and that [the] man regularly pointed his black pistol at the victims and threatened to shoot them" and offenses occurred approximately one hour apart); *see also Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008) ("Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual. No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person.").

but "the State still must show that this extraneous evidence is necessary to prove the case that [DeRouen] is on trial for" or the evidence "becomes highly prejudicial under Texas Rules of Evidence 403." DeRouen then focuses his argument on the Rule 403 balancing test. We therefore turn to Rule 403 and conclude that the trial court did not abuse its discretion by allowing evidence of the three extraneous offenses.

The probative value of the extraneous offenses was high. *See Gigliobianco*, 210 S.W.3d at 641 (stating that probative value "means more than simply relevance" and instead "refers to the inherent probative force of an item of evidence," specifically, "how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation").

First, the extraneous offenses were highly similar to the charged offense. Each of the offenses occurred at a fast-food restaurant early in the morning. In each offense, a lone suspect walked into the restaurant and displayed a gun before demanding money from the employees and then ordering the employees into the freezer. In each offense, the suspect wore identical clothing, including a gray hoodie, sunglasses, a face covering, and black shoes with a white or silver emblem on the tongue. In each offense, the suspect left the scene in a dark-colored sedan. In one of the extraneous offenses, the suspect carried a plastic bag for the money. Body camera footage from DeRouen's arrest showed that his car did not have license plates, a

11

detail that can also be seen on the surveillance footage from the Burger King. The similarity of the extraneous offenses to the charged offense was probative to rebut DeRouen's defensive theory that he did not commit the robbery of the Burger King. *See Bargas v. State*, 252 S.W.3d 876, 893 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (concluding that similarity of extraneous offense evidence rebutted defendant's theory that complainant in charged offense fabricated allegations against him).

Second, the extraneous offenses were close in time to the charged offense. DeRouen pleaded guilty to committing three robberies occurring within a week of the charged offense. The charged offense occurred on February 5, 2020. The first two extraneous offenses occurred on February 1 and February 3, 2020, and the third extraneous offense, which led to DeRouen's arrest, occurred on February 7, 2020. *See Gaytan v. State*, 331 S.W.3d 218, 226–27 (Tex. App.—Austin 2011, pet. ref'd) (considering remoteness of extraneous offense as "one aspect of an offense's probativeness"); *see also Clifford v. State*, 653 S.W.3d 1, 10 (Tex. App.—Austin 2022, pet. ref'd) (considering "significant similarities" between extraneous and charged offenses as well as fact that offenses "occurred approximately one hour apart").

The State had great need for the extraneous offense evidence. Neither Valdez nor Orellana, the two eyewitnesses to the robbery, identified DeRouen as the robber.

12

The suspect wore sunglasses and a mask, and Valdez could not see his face. The crime scene investigator did not recover any usable fingerprints or DNA evidence from the scene: review of the Burger King surveillance footage shows that the suspect used the plastic bag he carried to avoid directly touching surfaces in the restaurant. *See Clifford*, 653 S.W.3d at 11 (stating that trial court reasonably could have concluded that State's need for evidence weighed in favor of admitting extraneous offense because none of State's witnesses were able to identify perpetrator). Through the extraneous offenses, however, the State was able to link the clothing the suspect wore in the surveillance footage to the clothing DeRouen was wearing at the time of his arrest two days later.

The Court of Criminal Appeals has acknowledged that "an extremely similar extraneous offense always carries the potential to impress the jury of a defendant's character conformity, an impression the law seeks to avoid." *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996). However, a trial court can minimize that impermissible inference by using a limiting instruction. *Id.*; *Clifford*, 653 S.W.3d at 10–11. Here, the trial court instructed the jurors in the charge that they "cannot consider testimony of extraneous offenses for any purpose unless [they] find and believe beyond a reasonable doubt that the defendant committed any such extraneous offense," and if they did, they "may only consider the same as it relates to the identity of the defendant in connection with the offense alleged against the

defendant in the indictment in this case and for no other purpose."[3] Moreover, the extraneous robbery offenses were "no more heinous" than the charged robbery offense and therefore were "not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose." *See Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996).

Turning to the time needed to develop the extraneous offense evidence, we note that this evidence took up a significant portion of the trial. The jury heard testimony over two days: the first day was devoted to testimony directly about the charged offense, but the second day was devoted to the extraneous offenses and testimony from an HPD officer linking DeRouen to the charged offense through his clothing in the Burger King surveillance video and at the time of his arrest. The State spent roughly equal amounts of time presenting evidence on the charged offenses and developing the extraneous offenses.

A significant portion of the trial concerned the extraneous offenses. However, the probative value of this evidence was high, the State had great need for the evidence, and the trial court's limiting instruction ameliorated the risk of unfair prejudice from the evidence. We hold that the trial court did not abuse its discretion

---

[3]   Appellate courts generally presume that the jury follows the trial court's instructions in the manner presented, unless that presumption is rebutted by evidence showing that the jury did not follow the instruction. *Wappler v. State*, 183 S.W.3d 765, 780 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). DeRouen points to no evidence that the jury did not follow the trial court's instruction in the jury charge.

by ruling that the prejudicial effect of the three Harris County extraneous offenses did not substantially outweigh the probative value of this evidence and admitting the evidence under Rule 403.

We overrule DeRouen's first issue.

## Authentication of Surveillance Video

In his second issue, DeRouen argues that the trial court erred by admitting the surveillance video from the Burger King because the sponsoring witness was unable to properly authenticate it.

### A. Standard of Review and Governing Law

A key component in the admissibility of evidence is the evidence's relevance to an issue in the case, that is, "its tendency to make a fact of consequence to determination of the action more or less probable." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012); *see* TEX. R. EVID. 401, 402. "Evidence has no relevance if it is not authentically what its proponent claims it to be." *Tienda*, 358 S.W.3d at 638. Authentication is therefore a condition precedent to the admissibility of evidence and requires the proponent of the evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Hines v. State*, 608 S.W.3d 354, 365 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting TEX. R. EVID. 901(a)).

Courts treat a video recording without audio like a photograph, and such a recording is properly authenticated "when it can be proved that the images accurately represent the scene in question and are relevant to a disputed issue." *Fowler v. State*, 544 S.W.3d 844, 849 (Tex. Crim. App. 2018). Rule 901(b) provides several non-exclusive examples of evidence that satisfies the authenticity requirement, including testimony from a witness with knowledge "that an item is what it is claimed to be" and "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." TEX. R. EVID. 901(b)(1), (4); *Fowler*, 544 S.W.3d at 848. Authenticating evidence may be direct or circumstantial. *Butler v. State*, 459 S.W.3d 595, 602 (Tex. Crim. App. 2015).

The rule does not require "[c]onclusive proof of authenticity" before the trial court may permissibly admit the evidence. *Fowler*, 544 S.W.3d at 848; *see also Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.) (stating that proponent of evidence need not "rule out all possibilities inconsistent with authenticity") (quotation omitted). Instead, Rule 901 "merely requires some evidence sufficient to support a finding that [the] evidence in question is what the proponent claims." *Fowler*, 544 S.W.3d at 848 (quotation omitted); *Butler*, 459 S.W.3d at 605. The jury has the role of ultimately determining whether an item of evidence is what its proponent claims; "the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient

to support a reasonable jury determination that the proffered evidence is authentic." *Fowler*, 544 S.W.3d at 848–49 (quotation omitted). This is a "liberal standard of admissibility." *Id.* at 849 (quotation omitted).

We review a trial court's ruling on authentication for an abuse of discretion. *Id.* at 848. A trial court does not abuse its discretion in admitting evidence when it "reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified." *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

## B.    Analysis

Valdez, the Burger King manager, testified that the restaurant had surveillance cameras. After she left the freezer, she checked the monitors displaying the feed from the cameras, located in the office, to see if the robber had left the restaurant. She later showed an officer the surveillance cameras so he could review the footage. The State did not offer the recording of the surveillance footage into evidence during Valdez's testimony.

Pearland Police Department Officer Michael Pace responded to Valdez's 911 call and arrived at the restaurant shortly thereafter. He testified that he spoke with Valdez, who informed him that the Burger King had a surveillance system. He reviewed the footage and obtained a copy of the video recording. He identified his initials on the DVD of the footage and agreed that the contents "accurately depict

17

the events that occurred on February the 5th of 2020." The State then offered the video recording into evidence.

After defense counsel objected that Pace could not "authenticate how this video was made," the State asked Pace two follow up questions. Pace testified that he was present when the video was downloaded, and he agreed that the operator was "competent to operate that equipment." Defense counsel then objected that Pace could not "testify whether or not that equipment was in good working order [or] whether or not he had knowledge of how that equipment worked," and he had "no knowledge of whether or not it is a true and accurate depiction because he was not there at the time the video was being recorded."

In response to further questioning by the State, Pace testified that the timestamp on the surveillance video was not completely accurate: the time was "five to six minutes ahead," but the date was correct. He also testified that prior to obtaining the recording, he viewed surveillance images with Valdez, who was present during the robbery. He agreed with the State that Valdez "indicate[d] to [Pace] that it was consistent on the video with what had actually occurred." The trial court overruled the objection and admitted the recording of the surveillance footage.

The recording had no audio but contained footage from several different camera angles. An outdoor camera showed a dark-colored, four-door Nissan sedan pulling into the parking lot, the suspect getting out of the vehicle, Orellana escaping

18

from the restaurant and running through the parking lot, and the suspect getting back into the vehicle and leaving the scene a few minutes later. No license plates were visible on the vehicle. An interior camera focused on the front door showed the suspect, who had no part of his face visible, enter the restaurant and grab at his waistband. Footage from different angles showed that the suspect wore a gray hoodie, had a black firearm and a plastic bag, and wore black shoes with a white emblem on them. Various camera angles showed the suspect interacting with Valdez, Valdez opening the safe while the suspect stood behind her, the suspect taking money from Valdez, the suspect putting his weapon away, and the suspect using the plastic bag to open the door as he left the restaurant.

On appeal, DeRouen argues that Pace could not properly authenticate the recording of the surveillance footage, noting that Pace did not request that Valdez pull up a specific timeframe on the footage, the timestamp did not match the time of the robbery, the video alone could not establish the identity of the suspect, and there was no testimony that the video had not been tampered with or altered. He further argues that Pace testified that the surveillance cameras were approximately five or six minutes ahead of the actual time, perhaps indicating that the recording system was not properly functioning. Moreover, the State called Valdez to testify but never asked her whether the surveillance system was properly functioning, how the system functioned, or why the footage displayed a different time. He argues that the trial

19

court's decision to admit the video recording was outside the zone of reasonable disagreement. We disagree.

The State presented sufficient circumstantial evidence to authenticate the video recording. Pace responded to Valdez's 911 call shortly after she made the call. Both Pace and Valdez testified that they spoke about what had happened and then Valdez showed Pace the surveillance system so he could review the footage. Pace testified that he viewed surveillance images with Valdez, and Valdez indicated to him that what was depicted in the video was consistent with what actually happened during the robbery. Although the timestamp of the surveillance footage did not exactly match up to the accurate time, it was only five or six minutes ahead, and the date-stamp on the footage did match the accurate date. The contents of the surveillance footage match Valdez's and Orellana's descriptions of the robbery. The videos run continuously, and there is no indication that the footage has been tampered with or altered.

The State could have presented testimony from Valdez to further authenticate the video recording, but it was not required to do so. *See Fowler*, 544 S.W.3d at 850 (upholding trial court's ruling that investigating officer's testimony concerning surveillance footage was sufficient to authenticate video recording of footage and additional testimony from store manager was not required for trial court's ruling to

be within "zone of reasonable disagreement").[4] Rule 901 does not require the State to conclusively prove the authenticity of the video recording. *See id.* at 848. Instead, the Rule "merely requires some evidence sufficient to support a finding that [the] evidence in question is what the proponent claims." *Id.* (quotation omitted). We conclude that hurdle was crossed here.

The trial court's determination that Pace provided sufficient evidence to properly authenticate the video recording of the surveillance footage was at least within the zone of reasonable disagreement. *See id.* at 850 ("[A] zone of reasonable disagreement is exactly that—a zone."); *Butler*, 459 S.W.3d at 600 (stating that jury has ultimate role to determine that evidence is what its proponent claims, and trial court "need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic"). We therefore hold that the trial court did not abuse its discretion by admitting the recording of the surveillance footage.

We overrule DeRouen's second issue.

---

[4]    We have followed *Fowler* in an unpublished memorandum decision and concluded that the trial court did not abuse its discretion in ruling that an investigating officer properly authenticated a video recording of surveillance footage when the officer requested the footage on the day of the robbery, he watched the store manager download the footage onto a flash drive, he met both the store employee and the defendant, and he watched the footage and determined that the footage showed the employee, the defendant, and the date of the robbery. *See Verdine v. State*, No. 01-18-00884-CR, 2020 WL 1584468, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2020, pet. ref'd) (mem. op., not designated for publication).

## Modification of Trial Court's Judgment

Finally, we address an issue that the parties did not raise in their appellate briefs: whether we should modify the trial court's judgment to reflect that DeRouen pleaded "Not true" to the enhancement paragraph rather than "True."

An appellate court has authority to reform a judgment to make the record speak the truth when the matter has been called to its attention by any source. *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Van Flowers v. State*, 629 S.W.3d 707, 710–11 (Tex. App.—Houston [1st Dist.] 2021, no pet.). We may do so on our own motion if the parties do not raise the error in their appellate briefs. *Vasquez v. State*, 674 S.W.3d 593, 599 (Tex. App.—Houston [1st Dist.] 2023, no pet.). The Texas Rules of Appellate Procedure also provide "direct authority" for an appellate court to modify a trial court's judgment. *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.) (modifying judgment to reflect that defendant pleaded "not guilty" to charged offense); TEX. R. APP. P. 43.2(b) (providing that appellate court may "modify the trial court's judgment and affirm it as modified").

We may modify a trial court's judgment to accurately reflect a defendant's plea to an enhancement paragraph. *Edwards v. State*, 497 S.W.3d 147, 164 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (modifying judgments to reflect that defendant pleaded "true" to first enhancement paragraph in each indictment). Here,

22

the State read the allegations in an enhancement paragraph at the beginning of the punishment phase. DeRouen then pleaded "Not true" to this enhancement paragraph. The judgment of conviction, however, reflected that DeRouen pleaded "True" to the enhancement paragraph.

We modify the judgment of the trial court to reflect that DeRouen pleaded "Not true" to the enhancement paragraph. *See id.*; TEX. R. APP. P. 43.2(b).

## Conclusion

We modify the judgment of the trial court and affirm as modified.


David Gunn
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.

Do not publish. TEX. R. APP. P. 47.2(b).